# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETHANY KATHLEEN PRICE,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No.  1:15-cv-01676-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 12, 17, 22) |

## I.

## INTRODUCTION

Plaintiff Bethany Kathleen Price ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from fibromyalgia, hypothyroidism, bilateral hammertoes, and a gastrocnemius equinus deformity bilaterally.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 4, 6.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on May 9, 2012, alleging disability beginning on December 1, 2009.  (AR 170-73.)  Plaintiff's application was initially denied on September 26, 2012, and denied upon reconsideration on June 3, 2013.  (AR 99-103, 107-12.)  Plaintiff requested and received a hearing before Administrative Law Judge Catherine R. Lazuran ("the ALJ").  Plaintiff appeared for a video hearing on May 7, 2014.  (AR 29-71.)  On July 25, 2014, the ALJ found that Plaintiff was not disabled.  (AR 10-24.)  The Appeals Council denied Plaintiff's request for review on September 15, 2015.  (AR 1-3.)

### A.    Hearing Testimony

Plaintiff testified at the May 7, 2014 video hearing and was represented by counsel.  (AR 29-71.)  Plaintiff was fifty years old at the time of the hearing and married with a fourteen year old daughter.  (AR 32-33.)  Plaintiff has a driver's license.  (AR 33.)

She graduated high school and then earned a certificate from manicuring school in 1983 or 1984.  (AR 33-34.)  She quit doing manicuring work in 1998 or 1999 at the suggestion of her doctor.  (AR 38-39, 49.)  Between 1999 and 2003, she was self-employed buying and investing in properties.  (AR 37-38.)

Between April 2003 and November 2009 she worked for S&S Construction taking care of the model homes and the designing and working on the plans.  (AR 34-35.)  She inputted information into the computer and was also on job sites.  (AR 34.)  The most she lifted was 50 pounds.  (AR 34.)  Her father allowed her to work when she could, but when he quit and she worked for someone else there, it did not work as well and it became difficult.  (AR 35, 40.)  The stress also made it worse.  (AR 40.)  She was laid off around August 2010.  (AR 35.)  She usually worked two-and-a-half days a week and at most four days a week.  (AR 40.)

She testified that she had last worked approximately three years before the hearing as an assistant for her father at his construction company.  (AR 34.)  She also testified that she has not had a source of income, looked for work, or done volunteer work since December of 2009.  (AR

1   39.)

2          She testified that she cannot do any work because she is in a foggy mental state and in a

3   lot of pain every day.  (AR 39-40.)

4          Her condition has worsened since December of 2009.  (AR 40.)   At the time of the

5   hearing, she was using Nabumetone, Provigil, thyroid medication, and Protonix, and had recently

6   been put on Savella again.  (AR 40.)   The side effects of the medication include memory

7   problems, dry mouth, fatigue, lightheadedness, dizziness, and depression.  (AR 41.)   She was

8   switched to Nabumetone when they stopped making Relafen, which helped her and was a

9   medication that she took since she was diagnosed in 1997.  (AR 41-42.)   The medication she

10  takes for pain helps with the swelling, pain, and the tightness.  (AR 43.)   However, the

11  medication does not help with the fogginess in her head and her ability to think straight.  (AR

12  43.)

13         She has not been to the emergency room since December 2009 and her only

14  hospitalization was for gall bladder surgery.  (AR 41.)   She has never been to a rheumatologist

15  and has been treated since 1997 by Dr. Susan Helper, an internist.  (AR 42.)   She has not had any

16  counseling since 2009.  (AR 42.)   She thinks that at times she probably needed counseling, but

17  she thinks that she has "dealt with it pretty good."  (AR 42.)   She has not had counseling because

18  she has been trying to deal with it on her own and she does not want to go on "antidepressants

19  and things like that" if she does not have to.  (AR 43.)   She said that a podiatrist wants to

20  perform surgery in both of her legs to cut and extend her ligaments, but she is "just trying to go

21  as long as [she] can before [she has] to have that done."  (AR 44-45.)

22         She testified that she has not slept very well since December of 2009 and that if she gets

23  five hours, it's good.  (AR 42.)   However, even when she gets five hours of sleep, it is not a deep

24  sleep, and there are some days she cannot "go at all."  (AR 42.)

25         On a scale of zero to ten, her pain averages at a seven or eight, but it goes to ten on bad

26  days.  (AR 43.)   She indicated that at about the tenth day of top of the scale pain that she gets

27  down, but if she stays in bed long enough, it relieves it.  (AR 43.)

28         She has been able to get dressed and groomed on her own since December of 2009.  (AR

43.)  She has not been doing as much housework, but she does what she can.  (AR 44.)  She attends Bible meetings as much as she can and she usually goes at least once a week.  (AR 46.)  She has friends.  (AR 46.)  She has not really spent time on hobbies since 2009, but she uses an iPad to get emails and Google things every other day.  (AR 47.)  She does laundry, drives, shops for food, and has been reading.  (AR 44, 47-48.)  However, her husband pays the bills because she cannot keep the numbers and information straight.  (AR 48.)  All of her abilities and time is taken up by trying to take care of her family and function each day.  (AR 49.)

Her daughter has been in a combination homeschooling and school program where she attends school twice a week since last year because she helps a lot at home and because Plaintiff cannot keep a schedule.  (AR 48, 50.)  Plaintiff meets with her daughter's teacher once every six weeks and she makes sure that her assignments are done.  (AR 48.)  Her daughter helps Plaintiff do "regular things around the house" every day.  (AR 50.)  She thinks that she could not do as much as she is now doing if her daughter was not homeschooled.  (AR 50-51.)  Prior to her daughter being homeschooled, she would go sit in the classroom if the teacher asked her to bring a snack or something.  (AR 49.)

She testified that she used to walk, but she has not been able to exercise for the last two-and-a-half or three years.  (AR 44.)  She tries to sit on the floor and stretch.  (AR 45.)  She has not done any water exercise because she does not have access to a pool and she has not done physical therapy.  (AR 45-46.)

She recently went on a cruise to Puerto Rico that lasted eight days.  (AR 46.)  She took a cruise to the Mediterranean for ten days for her 25th anniversary approximately two years before the hearing.  (AR 46.)  She says that she is able to travel if she can be on a boat and rest.  (AR 47, 51.)  She says that her husband wants to travel when he can, but she cannot do it on land and it is best for her to travel by ship.  (AR 51.)  She says that she stays in her room if necessary while her family is out doing activities.  (AR 51.)  A year prior to the hearing, she went to the beach where her parents live and stayed in her trailer on a parking lot for three days.  (AR 47.)

She thinks that she could not do the design coordinator work that she used to do because she does not know each day whether she is able to meet for an appointment because she may not

feel well or she may not have slept well.  (AR 49.)  She thinks that she could not do the manicurist type job because it would be very difficult for her to sit on a stool and do the manicuring with the swelling and aching in her legs, shoulders, and neck areas.  (AR 49.)

If Plaintiff overdoes it, then she has bad days where she cannot get out of bed.  (AR 51-52.)  She thought that because of the stress level of the hearing she would be in bed for three or four days.  (AR 52.)  She has had times where she cannot do anything for a week or ten days.  (AR 52.)  She thinks that it seems to be worse in the severe heat, severe cold, when she is under a lot of stress, or when things are going on with her family.  (AR 52.)  She does not ever have a normal day, but does not feel like she has the flu.  (AR 52.)

Dr. Irving Kushner, a rheumatologist, testified as an independent medical expert.  (AR 52-63.)  He reviewed the medical evidence, did not notice any conflicts in it, and believed that there was sufficient medical evidence to allow him to form an opinion on Plaintiff's medical condition.  (AR 53.)  He stated that she has thyroid disease, hypothyroidism, high cholesterol, biliary dyskinesia,[2] bile reflux, and gastritis.  (AR 54.)  He noted that people with the thyroid issue can have the same manifestations as people with fibromyalgia and he wondered if some of her symptoms are attributable to her thyroid disease.  (AR 54.)

Dr. Kushner testified that the fact that a physician diagnosed Plaintiff with fibromyalgia does not bear on his conclusions.  (AR 55.)  The first paragraph of the criteria requires a pain in all quadrants of the body, the right and left sides of the body, both above and below the waist, and axial skeletal pain, cervical spine, anterior chest, thoracic spine or low back that has persisted for three months.  (AR 55.)  He did not see anywhere in the record where the distribution of pain is described.  (AR 55.)  For the "A criteria" a person has to have 11 tender points when a physician performs digital palpation with an approximate force of nine pounds.  (AR 55.)  He indicated that he did not know how much pressure was exerted by the examiner and whether it met the criteria.  (AR 56.)

Based on the record he reviewed, he found that the criteria are not met and he is inclined

---

[2] Dr. Kushner testified that biliary dyskinesia is where the power of bile through the biliary drainage system is imperfect.  (AR 59.)

1   to think that her symptoms may be related to her thyroid disease.  (AR 56.)  He did not think that

2   she had any severe impairment in his area of expertise, rheumatology.  (AR 56, 58-59.)  He was

3   not qualified to give an impression of the severity of her biliary disease or thyroid disease, but he

4   thought that they did not sound too bad from the general description.  (AR 59.)

5       He did not think that there is evidence that she meets or equals any Listing.  (AR 56.)  He

6   did not think that Plaintiff would have any limitations in lifting, standing, walking, sitting, and

7   related functions.  (AR 57.)  He was not saying that the hypothyroidism was severe as he is not

8   an endocrinologist.  (AR 56.)  In his opinion, none of Plaintiff's medical conditions were likely

9   to significantly impair her ability to function, but he is not an expert in any other fields besides

10  rheumatology.  (AR 59-60.)  When the ALJ asked Dr. Kushner whether he agreed with Dr.

11  Bhangoo's heavy exertional capacity assessment, he responded that he agreed with it.  (AR 57-

12  58.)  He did not find anything in the medical record that indicated that she had a medically

13  determinable condition which would permit him to conclude that her functional capacity was

14  significantly impaired.  (AR 62.)

15      He testified that there was evidence that she had symptoms, but the only diagnosis

16  offered to explain those symptoms was fibromyalgia.  (AR 61.)  He found that the record did not

17  conform with the ruling from the Social Security Administration for fibromyalgia.  (AR 61.)  He

18  found that she has unexplained pain.  (AR 61.)

19      He stated that he did not notice anything in the records indicating that Plaintiff had

20  problems complying with the medical treatment.  (AR 58.)  He has treated a number of patients

21  who have been diagnosed with fibromyalgia and he indicated that most of the time people who

22  are diagnosed with fibromyalgia do not do very well in response to the treatments that the

23  doctors employ.  (AR 62-63.)  He stated that treatments for fibromyalgia include medications,

24  which have a minimal, relatively small effect, exercise, psychotherapy, and cognitive behavioral

25  therapy.  (AR 62-63.)  He indicated that he has had patients improve from acupuncture and

26  massages by their husbands.  (AR 63.)

27      A vocational expert ("VE") Nancy Rend also testified.  (AR 63-69.)  The VE

28  characterized Plaintiff's work for her father and with the construction company as decorator,

DOT code 298.381-010, light work, and SVP 7, and administrative assistant, DOT code 169.167-018, sedentary work, and SVP 7.  (AR 64.)  The VE testified that Plaintiff's work as a manicurist would be DOT code 331.674-010, sedentary work, and SVP 3.  (AR 64.)  Plaintiff has skills from her job as an administrative assistant and decorator that are transferrable to other jobs, but decorator is a more closely refined position.  (AR 64-65.)  Reception work would be the general skill set that would transfer to other jobs.  (AR 65.)

The first hypothetical that the ALJ asked the VE was for an individual who is the same age and has the same education and past relevant work experience as Plaintiff.  (AR 65.)  The individual is able to lift 100 pounds occasionally and 50 pounds frequently, stand, walk, and sit eight hours a day, and frequently bend, stoop, crouch, crawl, and use his or her hands.  (AR 66.)  The VE testified that that individual could do all of Plaintiff's past relevant work.  (AR 66.)

The second hypothetical that the ALJ asked added the limitation that the person would do best with tasks not involving the pressure of extremely strict deadlines, but could do simple, routine, repetitive tasks and complex tasks.  (AR 66.)  The VE testified that that individual probably could not perform the job of decorator, but there would be administrative assistant positions that would not require meeting strict deadlines.  (AR 66.)  The VE also testified that the manicurist position would not require deadlines.  (AR 66.)  There are approximately 400,000 administrative assistant jobs nationally and 90,000 in the California, and with the erosion because of the limitations of the hypothetical, the individual would be able to perform approximately 40 percent of those jobs.  (AR 67.)

The third hypothetical that the ALJ asked the VE changed the limitations to lifting 50 pounds occasionally and 25 pounds frequently and standing and walking 6 of 8 hours.  (AR 67.)  That individual would be able to perform the administrative assistant job and manicurist job.  (AR 67.)  In addition, that individual could work as an office helper, DOT code 239.567-010, light work, SVP 2, and which has over 30,000 jobs nationally and 1,000 in California; storage rental clerk, DOT code 295.367-026, light work, SVP 2, and which has over 10,000 jobs nationally and 1,000 in California; and order clerk, DOT code 209.567-014, sedentary work, SVP 2, and which has approximately 20,000 jobs nationally and 2,000 in California.  (AR 67-

68.)

The fourth hypothetical that the ALJ asked added an option to sit or stand where the individual could stand 30 to 60 minutes at a time and sit 30 to 60 minutes at a time.  (AR 68.) The VE testified that that individual could perform the office worker, administrative assistant, order clerk, and office helper jobs because a person has control over when he or she does many of the tasks for these jobs and whether he or she sits or stands.  (AR 68.)  However, the manicurist job is performed almost entirely sitting and one could not take breaks.  (AR 68.)  The storage rental clerk position does not have a completely sit/stand at will option, but there is a lot of variation between sitting and standing, much of which the person would have control of.  (AR 68-69.)

Plaintiff's counsel then asked the VE a hypothetical for an individual who could lift 20 pounds occasionally and 10 pounds frequently, stand and walk for 2 hours and sit for 6 hours, alternate sit/stand in 30 to 60 minute increments, occasional manipulations in terms of reaching, handling, fingering, and feeling with both hands, could not be exposed to extreme hot or cold, could perform only simple, repetitive tasks, could not perform complex tasks, would be absent on an unscheduled basis for 2 to 3 days a month, and while at work would have a 20% time off task.  (AR 69.)  That individual would not be able to perform any of the jobs discussed and he or she would not be able to maintain competitive employment.  (AR 69.)  Unscheduled absences of 2 to 3 times per month or being off task 20 percent of the time would be sufficient for a finding that there were no jobs available for that individual.  (AR 69.)

### B.     ALJ Findings

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2014;

- Plaintiff has not engaged in substantial gainful activity since December 1, 2009, the alleged onset date;

- Plaintiff has the following severe combination of impairments: fibromyalgia; hypothyroidism; bilateral hammertoes; and a gasterocnemius equinus deformity

bilaterally;

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments;

- Plaintiff has the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR 404.1567(b) except that she can stand and walk for six of eight hours; sit for six of eight hours; requires an option to sit or stand and can do those thirty to sixty minutes at a time; and can frequently bend, stoop, and crouch;

- Plaintiff is capable of performing past relevant work as an administrative assistant (skilled; sedentary exertion), DOT 169.167-018. This work does not require performance of work-related activities precluded by Plaintiff's RFC;

- Plaintiff has not been under a disability, as defined in the Social Security Act, from December 1, 2009, through the date of the ALJ's decision.

(AR 10-24.)

## III.

## LEGAL STANDARD

An individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). The Court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

1 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

2 conclusion that must be upheld.")

3                                              **IV.**

4                              **DISCUSSION AND ANALYSIS**

5        Plaintiff's challenge to the disability finding can be broken down into three main

6 arguments.  First, Plaintiff asserts that the ALJ erred in discrediting Plaintiff's subjective pain

7 testimony.[3]  Second, Plaintiff contends that the ALJ erred in rejecting the lay witness testimony

8 of her mother, Patsy Schaeffer.   Third, Plaintiff argues that the ALJ erred by rejecting Dr.

9 Helper's opinion and giving great weight to the two consultative internal medicine examiners

10 and two state agency physical reviewing physicians.  Defendant counters that the ALJ properly

11 evaluated Plaintiff's credibility, the lay witness testimony, and the medical evidence in the

12 record.[4]

13        **A.       The ALJ Did Not Err in Discrediting Plaintiff's Testimony**

14        Plaintiff contends that the ALJ improperly rejected her subjective pain testimony because

15 the reasons that the ALJ gave are not clear and convincing reasons to reject her subjective pain

16 testimony.   Defendant counters that benefits cannot be awarded based simply on Plaintiff's

17 subjective complaints and the ALJ provided several legally valid reasons supported by

18 substantial evidence for not finding Plaintiff fully credible.

19        "An ALJ is not required to believe every allegation of disabling pain or other non-

20 exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation

21 and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or

22 symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674

23 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented

24 objective medical evidence of an underlying impairment which could reasonably be expected to

25 produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th

26 ─────────────────────
[3] While Plaintiff presented a separate section challenging the ALJ's evaluation of her activities of daily living, this
27 argument is properly addressed in the context of Plaintiff's credibility.

[4] Defendant questions whether Plaintiff even satisfies the criteria set forth in Social Security Regulation ("SSR") 12-
28 2p.  However, the Court does not answer this question as it is not essential to the Court's decision in this matter.

Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

1.   The ALJ Properly Discounted Plaintiff's Testimony Because Plaintiff Failed to Seek or Follow a Prescribed Course of Treatment

Plaintiff does not specifically address the ALJ's rejection of her testimony based on her failure to seek or follow a prescribed course of treatment in her opening brief. Defendant argues that the ALJ properly found that Plaintiff's failure to seek or follow a prescribed course of

treatment weighed against her claims that her symptoms were so severe as to be disabling.   In her reply, Plaintiff argues that any failure to follow a prescribed course of treatment is for her foot conditions and psychiatric care, but she is not appealing the decision as it pertains to her depression and any relief to Plaintiff's foot condition would not have "taken care of [her] fibromyalgia."

An "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

The ALJ pointed out that the record revealed a lack of mental health treatment.  (AR 13-14.)  While Plaintiff argues that she is not appealing the ALJ's decision as it pertains to her depression, she did allege that her depression prevented her from working.  (AR 194.)  Plaintiff's complaints included not only pain and fatigue, but also depression and other mental symptoms. The ALJ evaluated Plaintiff's credibility in light of all of her allegations.

The ALJ found that Plaintiff not partaking in any mental health treatment "strongly suggests that her symptoms and limitations are not severe."  (AR 13.)  Plaintiff told Dr. Michael Cohn during her psychiatric consultative evaluation on April 22, 2013, that she has not had any psychiatric treatment or psychotherapy and she has not been hospitalized for psychiatric reasons. (AR 330.)  Plaintiff does not point to any psychiatric treatment in the record nor does she argue that she actually has received any psychiatric treatment.  While the Court recognizes that the Ninth Circuit has found that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation," here, the ALJ also provided another example of Plaintiff's failure to seek or follow a prescribed course of treatment. Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989)).

The ALJ also discussed Plaintiff's visit with Dr. John Etcheverry, a podiatrist, on October 26, 2011.  (AR 18, 458-60.)  Dr. Etcheverry noted that Plaintiff's gastrocnemius equinus deformity exacerbates Plaintiff's fibromyalgia and hammertoe deformities.  (AR 459.)  He advised Plaintiff to participate in physical therapy and use a rocker bottom sole shoe. (AR 18, 459.)  He told Plaintiff that if these conservative methods of treatment failed, then she would

1 have to consider a surgical gastrocnemius resection along with metatarsal shortening osteotomies

2 and hammertoe deformities.  (AR 459.)  However, there is no evidence in the record that

3 Plaintiff participated in physical therapy as recommended.  Plaintiff even testified that she has

4 not done any physical therapy.  Although Plaintiff argues that this would "not have taken care of

5 [her] fibromyalgia," her foot conditions were exacerbating her fibromyalgia, so Plaintiff's failure

6 to seek and follow the prescribed course of treatment for her foot conditions could have impacted

7 the pain she felt in her legs and feet.

8      Therefore, the Court finds that the ALJ did not err in discrediting Plaintiff based on her

9 failure to seek or follow a prescribed course of treatment.[5]

10      2.   The ALJ Erred in Discounting Plaintiff's Testimony Because Plaintiff Received
11               Routine and Conservative Treatment

12      Plaintiff does not specifically address the ALJ's rejection of her testimony based on her

13 conservative treatment in her opening brief.  Defendant argues that the ALJ properly found that

14 Plaintiff's routine and conservative treatment was not commensurate with her alleged pain level.

15 Defendant asserts that Plaintiff only saw Dr. Helper, her primary treatment provider, a few times

16 a year.  In her reply, Plaintiff argues that this was an improper reason because Dr. Kushner's

17 testimony shows that the only other treatment options for treating her fibromyalgia were also

18 "conservative."

19      Evidence of conservative treatment is sufficient to discount a claimant's testimony

20 regarding the severity of the impairment.  Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

21 However, here, Dr. Kushner testified that he has treated a number of patients who have been

22 diagnosed with fibromyalgia and most of the time people who are diagnosed with fibromyalgia

23 do not do very well in response to the treatments that the doctors employ.  (AR 62-63.)  He

24 stated that treatments for fibromyalgia include medications, which have a minimal, relatively

25 small effect, exercise, psychotherapy, and cognitive behavioral therapy.  (AR 62-63.)  He

---

[5] Defendant notes that Plaintiff did not, except for one diagnostic visit, obtain treatment from a rheumatologist. While Plaintiff only visited a rheumatologist once, there is no indication that she ever received a referral to or was advised to go see a rheumatologist.

1    indicated that he has had patients improve from acupuncture and massages by their husbands.

2    (AR 63.)  Based upon Dr. Kushner's testimony, there is no indication in the record that there

3    were alternative treatment options available to Plaintiff that would have helped Plaintiff's

4    condition.  Therefore, the Court finds that the ALJ erred in discrediting Plaintiff because of her

5    conservative and routine treatment.[6]

6         3.    The ALJ Properly Discounted Plaintiff's Testimony Because Plaintiff's Condition
                Improved with Treatment
7

8         Plaintiff argues that the ALJ selectively picked the parts of the record that show

9    improvement or that do not mention complaints of pain and fatigue.  Defendant counters that the

10   record shows that Plaintiff repeatedly reported improvement in her condition and also stated that

11   medications controlled her symptoms.  Plaintiff argues that that the medications controlled her

12   symptoms only to a degree.

13        The ALJ noted several times in the record where Plaintiff's fibromyalgia had improved.

14   (AR 17, 18.)  On December 18, 2009, Plaintiff told Dr. Helper that she was doing fairly well on

15   her new thyroid medication and she feels a little foggy, but better.  (AR 277.)  On August 3,

16   2010, Plaintiff reported to Dr. Helper that she was feeling significantly better after being laid off,

17   she had more energy, she was exercising, and she was feeling better-rested.  (AR 276.)  On

18   January 12, 2011, Plaintiff stated during a visit with Dr. Helper that she was feeling better.  (AR

19   275.)  On October 18, 2011, Plaintiff told Dr. Helper that she was feeling good, she was not

20   working, she was exercising routinely, and her fibromyalgia was markedly better, although she

21   still had some fatigue.  (AR 274.)  On June 25, 2012, Plaintiff did tell Dr. Helper that her

22   fibromyalgia had gotten worse and that she was having difficulty functioning.  (AR 321.)  In

23   addition, the ALJ noted that Plaintiff did not voice any complaints other than fatigue for

24   approximately eight months in 2013 and 2014.  (AR 19, 443-46.)

25        Plaintiff also specifically stated that her medication relieved her fatigue.  On October 18,

26

27   ---
     [6] The error by the ALJ in finding Plaintiff not credible because of her conservative treatment is harmless where, as
     here, the other reasons the ALJ offers are proper and are supported by substantial evidence and the error does not
28   negate the validity of the ALJ's credibility conclusion.  See Carmickle, 533 F.3d at 1162 (citing Batson v. Comm'r
     of Soc. Sec., 359 F.3d 1190, 1197 (9th Cir. 2004)).

2011, Plaintiff told Dr. Helper that her fatigue was relieved with Provigil. (AR 273.) On September 5, 2012, Plaintiff told Dr. Gil Schmidt during a comprehensive psychiatric evaluation that she receives a benefit from her medications. (AR 313.) On September 17, 2013, Dr. Helper noted that Plaintiff was taking Provigil as needed for her somnolence and she tolerates it well. (AR 446.) On December 12, 2013, Dr.  Helper noted that Plaintiff's fatigue improved with Provigil. (AR 443.)

Plaintiff even testified during the hearing that the medication she takes for pain helps with the swelling, pain, and the tightness, although it does not help with the fogginess in her head and her ability to think straight. (AR 43.)

Therefore, there are multiple instances throughout the record where Plaintiff states that her medication improves her symptoms and she states that she feels good. This is not a case where the ALJ just "cherry-picked" a few times where a plaintiff felt better in contrast to many reports of bad days and severe symptoms. Therefore, the Court finds that the ALJ properly discredited Plaintiff based upon the improvement of her condition with treatment.

4.    The ALJ Properly Considered the Inconsistencies in Plaintiff's Testimony

Plaintiff does not specifically address the inconsistencies in Plaintiff's testimony in her opening brief.  Defendant argues that the ALJ properly considered the inconsistencies in Plaintiff's testimony.  In her reply, Plaintiff contends that the inconsistencies in her testimony are more seeming than real.

Plaintiff testified that her pain level increased when her stress level increased causing her to stay in bed, but she told Dr. Stuart Segal that changes in stress did not affect her. (AR 53, 263.) Although Plaintiff tries to argue that this was Dr. Segal's conclusion and not her own statement, it is in a section at the beginning of Dr. Segal's report with other statements by Plaintiff and no conclusions by Dr. Segal. (AR 263.) Plaintiff testified that she experienced medication side effects such as memory problems, dry mouth, fatigue, and dizziness, but Dr. Helper stated that she tolerated the Provigil well. (AR 42, 446.) Plaintiff also told Dr. Schmidt that she did not have any significant side effects to any of her psychiatric medications. (AR 313.)  Therefore, the Court finds that the ALJ properly considered the inconsistencies in

1 Plaintiff's testimony in discrediting her testimony.

2       5.    <u>The ALJ Properly Discredited Plaintiff Because Her Complaints Were Inconsistent with the Objective Findings in the Record</u>

3

4       Plaintiff argues that her complaints should not have been discredited just because they

5 were not supported by objective findings.  Defendant counters that the ALJ properly found that

6 Plaintiff's subjective complains were inconsistent with the objective mental and physical

7 evidence.

8       The determination that a claimant's complaints are inconsistent with clinical evaluations

9 can satisfy the requirement of stating a clear and convincing reason for discrediting the

10 claimant's testimony.  <u>Regennitter v. Commissioner of Social Sec. Admin.</u>, 166 F.3d 1294, 1297

11 9th Cir. 1999).  The ALJ properly considered the evidence in weighing Plaintiff's credibility.

12 "While subjective pain testimony cannot be rejected on the sole ground that it is not fully

13 corroborated by objective medical evidence, the medical evidence is still a relevant factor in

14 determining the severity of the claimant's pain and its disabling effects."  <u>Rollins v. Massanari</u>,

15 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

16       The Court recognizes that fibromyalgia is "diagnosed entirely on the basis of patients'

17 reports of pain and other symptoms" and common symptoms include "chronic pain throughout

18 the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can

19 exacerbate the cycle of pain and fatigue associated with this disease."  <u>Benecke v. Barnhart</u>, 379

20 F.3d 587, 589-90 (9th Cir. 2004).  The ALJ herself acknowledged that there are tender points

21 noted in some of the objective findings.  (AR 17-21.)

22       However, the ALJ discussed inconsistencies between the medical evidence and Plaintiff's

23 allegations regarding her alleged mental symptoms and impairments.  (AR 13-14.)  The ALJ

24 noted that although Plaintiff alleged memory problems and depression, her mental status

25 examinations showed relatively normal functioning.  (AR 13-14, 312-17, 330-34.)

26       Consultative psychiatric examiner Dr. Schmidt found that Plaintiff's mood was within

27 normal limits and she had a sense of humor.  (AR 315.)  He also found that she had a congruent,

28 spontaneous affect with frequent smiles, did not appear overly anxious and reported no fears

being away from home, had a responsive handshake, made appropriate eye contact, had a normal amount of energy, had neutral attitude and behavior, was polite, cooperative, and responsive to all questions, had a normal pace, volume, inflection, and articulation of her stream of mental activity and speech, had normal content of thoughts, had intact and functional immediate, recent, and past memory, was oriented, performed simple daily money calculations normally, had normal concentration, had intact cognitive thinking at the concrete level of reasoning, had an adequate range of affective expression and appropriate social cueing, had average judgment and insight, and had a normal fund of knowledge and information given her educational level.  (AR 315-16.)  Dr. Schmidt found that Plaintiff had an adequate functional level with no significant mental health impairment, although he noted that her degree of mental health functioning appears to be mildly impaired over the concomitant mental health history and she reported a subsequent depression due to her chronic pain.  (AR 316.)

Consultative psychiatric examiner Dr. Cohn found that Plaintiff was fully cooperative with all examination procedures and was able to volunteer information spontaneously, had no psychomotor agitation or retardation, appeared to be genuine and truthful, did not appear to be exaggerating or manipulating, had normal stream of mental activity, had normal and clear articulation in her speech with no neologisms, was not delusional and did not have any bizarre or psychotic thought content, had no suicidal or homicidal ideation and no paranoid ideation, denied recent auditory or visual hallucinations, had tight and coherent associations with no circumstantiality or tangentiality, had a euthymic mood and a normal and congruent affect with thought content, was not tearful, denied feelings of hopelessness, helplessness, and worthlessness, was alert and oriented, had no difficulties with past memory, could perform calculations,  and had intact concentration.  (AR 331-32.)  Dr. Cohn noted that although Plaintiff alleged that she had depression, she was able to joke and laugh during the interview and "there was no evidence of depression at all on the mental status examination."  (AR 333.)  He did not diagnose a mental impairment, found that she had a good psychiatric prognosis, and he did not assess any functional limitations.  (AR 333-34.)

Therefore, the evidence is inconsistent with Plaintiff's allegations regarding her mental

1  impairments.  Thus, the Court finds that the ALJ did not err by discounting Plaintiff's credibility

2  because of inconsistencies between Plaintiff's allegations and the medical record.

3      6.    The ALJ Properly Discounted Plaintiff's Testimony Based on Inconsistencies
            Between Plaintiff's Allegations and Her Statements Regarding Her Activities of
4            Daily Living

5      Plaintiff argues that the ALJ erred by discrediting her based on her activities of daily

6  living, because she failed to make specific findings relating to whether Plaintiff's activities of

7  daily living would be transferable to a competitive work setting for an 8-hour day.  Plaintiff also

8  argues that the ALJ glossed over the restricted extent of these activities and that these activities

9  would not be transferrable to a competitive work setting for an 8-hour day.  Defendant counters

10  that the ALJ properly found that Plaintiff's ability to engage in her activities of daily living

11  indicates that she was not as limited as alleged and her activities were inconsistent with her

12  allegations of a disabling impairment. Defendant also argues that controlling Ninth Circuit

13  precedent establishes that daily activities are grounds for rejecting a claimant's allegations to the

14  extent that they contradict claims of a totally debilitating impairment.

15      There are two ways for an ALJ to use daily activities to form the basis of an adverse

16  credibility determination: if the plaintiff's activities contradict her other testimony or if the

17  activities meet the threshold for transferable work skills.  Orn, 495 F.3d at 639.  In particular, an

18  ALJ may consider inconsistencies between a claimant's activities and her subjective complaints.

19  See Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 693 (9th Cir. 2009) (ALJ properly

20  determined that the claimant's daily activities "did not suggest [the claimant] could return to his

21  old job, but . . . did suggest that [plaintiff's] later claims about the severity of his limitations were

22  exaggerated"); Molina, 674 F.3d at 1112 (the ALJ may consider "whether the claimant engages

23  in daily activities inconsistent with the alleged symptoms") (internal citation omitted).

24      Here, the ALJ considered that Plaintiff's daily activities contradict her claims regarding

25  the severity of her symptoms.  The ALJ cited multiple statements in the record which indicate

26  that Plaintiff engages in more activities than her claimed limitations.  (AR 13, 16-17, 21.)

27      Plaintiff testified during her hearing that she home schooled her daughter, although her

28  daughter pretty much does it on her own, she attends Bible meetings at least once a week, she

1   can do the laundry, and she uses the internet every other day.  (AR 46, 48, 50.)  Plaintiff told Dr.

2   Bhangoo that she could do all household work including personal care, that she drove, and that

3   she goes grocery shopping.  (AR 337.)  She told Dr. Cohn that she has no difficulty completing

4   household tasks, and she takes care of her personal hygiene and is able to cook and clean on a

5   daily basis.  (AR 331.) [7]

6         While Plaintiff reported that her mental fogginess never subsided and she had problems

7   with reading, the testimony reflects that she used an iPad to get emails and Google things every

8   other day and that she was reading.  (AR 47-48, 331.)

9         The ALJ pointed to specific activities of daily living that support the conclusion that

10   Plaintiff's pain and limitations are not as severe as she alleged.  If the ALJ's interpretation is

11   reasonable and supported by substantial evidence, then it is not the Court's role to second-guess

12   it.  See Rollins, 261 F.3d at 857.

13         Accordingly, the Court finds that the ALJ provided clear and convincing reasons

14   supported by substantial evidence for discrediting Plaintiff. [8]

15   **B.     The ALJ Did Not Err By Discrediting Ms. Schaeffer's Testimony**

16         Plaintiff also argues that the ALJ erred by discrediting her mother, Patsy Schaeffer's

17   testimony.  Defendant counters that the ALJ provided germane reasons for discrediting the third

18   party testimony in this matter.

19         "In determining whether a claimant is disabled, an ALJ must consider lay witness

20   testimony concerning a claimant's ability to work."  Stout v. Comm'r of Soc. Sec., 454 F.3d

21

22   [7] The ALJ also referenced Dr. Schmidt's evaluation, which stated that Plaintiff could do light and heavy duty
domestic chores that might be limited by her reported physical pain.  (AR 17, 315.)  However, it is unclear whether

23   Plaintiff reported this statement to Dr. Schmidt or this is Dr. Schmidt's conclusion. If this statement is Dr. Schmidt's
conclusion and not a statement by Plaintiff regarding her daily activities, it may not be an accurate reflection of

24   Plaintiff's daily activities.  Therefore, this statement in Dr. Schmidt's evaluation does not support the ALJ's finding
that Plaintiff's daily activities are not limited to the extent one would expect given her complaints.  However, the

25   ALJ also pointed to statements by Plaintiff regarding her activities of daily living to support the decision to discredit
Plaintiff based on her daily activities.

26   [8] Defendant also argues that the ALJ properly discredited Plaintiff because of her work history and the fact that she
went on vacations.  However, the Court does not address these additional reasons as the Court has already found that

27   the ALJ provided clear and convincing reasons for discrediting Plaintiff and any error in the ALJ discrediting
Plaintiff based on these reasons would be harmless.  See Carmickle, 533 F.3d at 1162 (citing Batson, 359 F.3d at

28   1197).

1050, 1053 (9th Cir 2006); 20 C.F.R. § 404.1513(d)(4).  "Lay witness testimony is competent evidence and cannot be disregarded without comment."  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Nguyen, 100 F.3d at 1467).  The ALJ must give specific reasons germane to the witness in discounting the lay witness testimony.  Stout, 454 F.3d at 1056; Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).  If the ALJ gives reasons for rejecting the claimant's testimony that are equally relevant to similar testimony provided by lay witnesses, that would support a finding that the lay witness testimony is similarly not credible.  Molina, 674 F.3d 1114.

Here, the ALJ gave little weight to Ms. Schaeffer statements because it was "a lay opinion based upon casual observation, rather than objective medical examination and testing" and "it was potentially influenced by loyalties of family."  (AR 21.)  However, "friends and family members in a position to observe a [plaintiff's] symptoms and daily activities are competent to testify as to [his or] her condition."  Valentine, 574 F.3d at 694 (quoting Dodrill, 12 F.3d at 918-19).  Here, Ms. Schaeffer's third party testimony should not have been rejected just because she is an interested witness and she gave an opinion based on her observations.  Therefore, the Court finds that these are not germane reasons for rejecting Ms. Schaeffer's testimony.

The ALJ also gave little weight to Ms. Schaeffer's testimony because "[i]t does not outweigh the accumulated medical evidence regarding the extent to which [Plaintiff's] impairments limit her functional abilities."  (AR 21.)  Ms. Schaeffer's testimony in her Third Party Function Report regarding Plaintiff's limitations was similar to Plaintiff's own subjective complaints.  (AR 221-28, 230-37.)   As discussed above, the ALJ properly rejected Plaintiff's testimony on the basis that it was not consistent with the mental evidence in the record.  Therefore, the Court finds that this is a germane reason for giving little weight to Ms. Schaeffer's testimony.

Lastly, the ALJ gave limited weight to Ms. Schaeffer's testimony for the same reasons that she found that Plaintiff's testimony is not entirely credible.  (AR 21.)  If the ALJ gives reasons for rejecting the claimant's testimony that are equally relevant to similar testimony

1  provided by lay witnesses, then that would support a finding that the lay witness testimony is

2  similarly not credible.  Molina, 674 F.3d at 1114.  Therefore, the Court finds that this is also a

3  reason for giving little weight to Ms. Schaeffer's testimony.

4       Accordingly, the Court finds that the ALJ did not err in evaluating Ms. Schaeffer's

5  testimony.

6     **C.     The ALJ Did Not Err in Evaluating the Medical Opinions in the Record and
            Assessing Plaintiff's RFC**

7

8       Plaintiff argues that the ALJ erred in rejecting Dr. Helper's treating source opinion based

9  on a lack of objective findings.  Plaintiff asserts that the ALJ did not consider Dr. Helper's

10 opinion in the larger context of the treating relationship.  Plaintiff also takes issue with the ALJ's

11 reliance on the opinions of the internal medicine consultative examiners and the agency

12 reviewing physicians.

13      The weight to be given to medical opinions depends upon whether the opinion is

14 proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

15 821, 830-831 (9th Cir. 1995).  In general a treating physician's opinion is entitled to greater

16 weight than that of a nontreating physician because "he is employed to cure and has a greater

17 opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d

18 1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is

19 contradicted by another doctor, it may be rejected only for "specific and legitimate reasons"

20 supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d

21 1194, 1198 (9th Cir. 2008) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

22      Where the treating physician's opinion is contradicted by the opinion of an examining

23 physician who based the opinion upon independent clinical findings that differ from those of the

24 treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to

25 resolve the conflict.  Andrews, 53 F.3d at 1041.  However, if the nontreating physician's opinion

26 is based upon clinical findings considered by the treating physician, the ALJ must give specific

27 and legitimate reasons for rejecting the treating physician's opinion that are based on substantial

28 evidence in the record.  Id.  The contrary opinion of a non-examining expert is not sufficient by

1   itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's

2   opinion, however, "it may constitute substantial evidence when it is consistent with other

3   independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

4          Here, the medical sources in the record had conflicting opinions regarding Plaintiff's

5   condition and her limitations.  Where, as here, the medical evidence is conflicting, it is for the

6   ALJ to determine credibility and resolve the conflict.  Thomas, 278 F.3d at 956-57.

7          Dr. Helper opined that Plaintiff was permanently disabled in January 2012, but did not

8   assess any functional limitations.  (AR 320.)  In June 2012, Dr. Helper again opined that Plaintiff

9   was permanently disabled and noted that she cannot sit, lift, or carry for prolonged periods of

10  time.  (AR 321.)  In November 2012, Dr. Helper noted that Plaintiff has difficulty functioning

11  throughout the day and has to rest episodically and has leg, arm, and joint pain, which makes her

12  unable to work, including her previous work as a manicurist and in real estate.  (AR 326.)

13         Although the ALJ considered Dr. Helper's diagnosis of fibromyalgia, she gave no weight

14  to Dr. Helper's 2012 opinions because whether Plaintiff is disabled is an issue reserved for the

15  Commissioner and the opinions do not set forth Plaintiff's functional abilities with sufficient

16  specificity.  (AR 20.)  Plaintiff concedes that Dr. Helper's statements that she was totally and

17  permanently disabled were too vague and conclusory to warrant much weight and are on an issue

18  reserved for the Commissioner.  A treating physician's disability opinion is not entitled to

19  controlling weight or any special significance, because the ultimate issue of disability is for the

20  Commissioner to make, taking into account a variety of factors.  See Magallanes v. Bowen, 881

21  F.2d 747, 751 (9th Cir. 1989).  "The ALJ need not accept the opinion of any physician, including

22  a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical

23  findings."  Chaudhry v. Asture, 688 F.3d 661, 671 (9th Cir. 2012) (quoting Bray v. Comm'r of

24  Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009)).  Therefore, the Court finds that the ALJ

25  provided specific and legitimate reasons supported by substantial evidence to reject Dr. Helper's

26  2012 opinions.

27         On May 13, 2014, after Plaintiff's hearing, she saw Dr. Helper again.  (AR 461.)

28  Plaintiff told Dr. Helper that she was very stressed after the hearing and she was in bed because

1  of the stress and a flare-up of her pain.  (Id.)  Dr. Helper noted that Plaintiff is trained as a

2  manicurist, but Plaintiff can only sit for 10 minutes at a time without having to get up and move

3  around.  (Id.)  Plaintiff told Dr. Helper that there are at least 4 days a month where she feels she

4  cannot get out of bed and has to lay in bed because of pain and fatigue.  (Id.)  Dr. Helper found

5  that those would be days Plaintiff cannot work and has to call in sick.  (Id.)  She opined that

6  Plaintiff "is fully disabled and cannot perform her job."  (Id.)  She felt that Plaintiff meets the

7  qualifications for fibromyalgia because she has pinpoint tenderness in approximately 13 areas.

8  (Id.)  Dr. Helper did specify 13 areas where she found during the physical exam that Plaintiff had

9  pinpoint tenderness.  (Id.)  Dr. Helper also limited Plaintiff to sitting or standing for more than 10

10  minutes at a time and noted that there are times when Plaintiff is so fatigued she must stay in

11  bed.  (Id.)

12       The ALJ gave Dr. Helper's May 2014 opinion no weight for the same reasons she gave

13  no weight to Dr. Helper's other opinions.  (AR 21.)  The ALJ also rejected Dr. Helper's opinion

14  because Dr. Helper "relied heavily on the subjective report of symptoms and limitations provided

15  by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff]

16  reported."  (AR 21.)  The ALJ noted that there are good reasons for questioning the reliability of

17  Plaintiff's subjective complaints.  (AR 21.)  The ALJ did not need to accept Dr. Helper's brief

18  and conclusory opinion.  See Chaudhry, 688 F.3d at 671 (quoting Bray, 554 F.3d at 1228).

19  Further, an ALJ can reject a physician's opinion that is premised on a claimant's subjective

20  complaints that have been properly discounted.  See Fair, 885 F.2d at 605; Tommasetti, 533 F.3d

21  at 1041.  Therefore, as the ALJ properly discounted Plaintiff's subjective complaints, the Court

22  finds that the ALJ properly rejected Dr. Helper's 2014 opinion that was based on Plaintiff's

23  subjective complaints.

24       The ALJ gave substantial weight to internal medicine consultative examiner Dr. Birgit

25  Siekerkotte and great weight to agency physical consultant Dr. De la Rosa in support of the

26  ALJ's RFC assessment.[9]

27  _____

28  [9] While Plaintiff argues that the ALJ erred in relying upon two consultative examinations, the ALJ only gave "some
weight" to the second consultative examiner, Dr. Sarupinder Bhangoo's opinion.  (AR 19.)  Therefore, as the ALJ

1    Plaintiff attended an internal medicine consultative evaluation with Dr. Siekerkotte on

2  September 1, 2012.  (AR 306-09.)  The only functional limitations that Dr. Siekerkotte assessed

3  are limiting Plaintiff to standing and walking for up to 6 hours, lifting and carrying 50 pounds

4  occasionally and 25 pounds frequently, and using caution with regard to climbing and balancing

5  because of her history of fatigue.  (AR 309.)

6    The ALJ noted that Dr. Siekerkotte's assessment amounted to a finding that Plaintiff

7  could perform medium exertional work.  (AR 19.)  The ALJ gave Dr. Siekerkotte's opinion

8  "substantial weight because it is consistent with the evidence of record that demonstrates

9  conservative medical treatment, her improvement with medications and the fact that she did not

10  voice any complaints other than fatigue for approximately eight months in 2013 and 2014."  (AR

11  19.)  The ALJ did find that it was appropriate to include some postural limitations and a sit or

12  stand option.  (AR 19.)  As discussed above, Plaintiff's condition improved with treatment.  The

13  ALJ also pointed out that Plaintiff did not voice any complaints other than fatigue for

14  approximately eight months in 2013 and 2014.  (AR 19, 443-46.)  Therefore, the Court finds that

15  the ALJ did not err in giving substantial weight to Dr. Siekerkotte's opinion.  The Court notes

16  that Dr. Siekerkotte's opinion is substantial evidence for rejecting Dr. Helper's opinion and for

17  supporting the RFC assessment.  See Andrews, 53 F.3d at 1041.

18    The ALJ also gave great weight to agency physical consultant, Dr. C. De la Rosa's

19  September 17, 2012 assessment that Plaintiff could perform medium exertional work, because it

20  is well supported by the reports of the consultative doctor and the medical expert's testimony.

21  (AR 21.)  The ALJ also found that additional postural limitations and a sit or stand option are

22  reasonable.  (AR 21.)  Dr. De la Rosa's opinion that Plaintiff could perform medium exertional

23  work is consistent with Dr. Siekerkotte's opinion that Plaintiff could perform medium exertional

24  work.  (AR 72-83, 306-09.)  Dr. Kushner, the independent medical expert, opined that Plaintiff

25  did not have any functional limitations and he agreed with Dr. Bhangoo's opinion that Plaintiff

26

27           only gave this opinion some weight and gave Dr. Sierkerkotte's opinion substantial weight, the Court does not

28  address Dr. Bhangoo's opinion further.  The Court also does not further discuss agency physical consultant A. Lizarraras's May 22, 2013 assessment because the ALJ gave it little weight.  (AR 21.)

1  could do heavy work.  (AR 57-62.)

2      Therefore, the Court finds that the ALJ did not err because the ALJ's opinion sets forth

3  specific and legitimate reasons supported by substantial evidence in the record for the RFC

4  assessment adopted by the ALJ.  See Magallanes, 881 F.2d at 751.

5                                            **V.**

6                                          **ORDER**

7      Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

8  Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be

9  entered in favor of Defendant Commissioner of Social Security and against Plaintiff Bethany

10 Kathleen Price.  The Clerk of the Court is directed to CLOSE this action.

11

   IT IS SO ORDERED.

12

13 Dated:   **February 23, 2017**

                                        UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25